Lampson *et al.* *vs.* New-Haven.</div>

EBENEZER TOWLE, Orator, *vs.* JAMES MACK and CHARLES PHELPS; Respondents.

<div align="right">WINDHAM, *February,* 1829.</div>

That A, receiving trust-property, knowing it to be such, in payment of his own debts, is liable to account for the same, with the *cestui que trust.*

That the defendant, in rendering his account of trust-property, if he would avail himself of a pledge of personal property to secure to him a sum of money, must not answer by merely describing the written pledge : but must aver what sum was due to which the pledge might attach.

That, though the defendant deny the trust set up in the bill, yet if he acknowledges those facts which show the trust, the Orator will be entitled to his account.

That the Trustee is entitled to have the costs and expenses allowed him of suits and an arbitration, expended in good faith in the concern of the trust.

But not the costs suffered after he has been called upon and refused to surrender the trust.

WINDHAM, *February*, 1829.

Towle *vs.* Mack *et al.*

The Orator complained that *Mack* was bail for him in a certain case on the twenty fourth day of March 1819, and that the Orator, for his security, conveyed to him his farm, containing seventy acres of land, and delivered him certain stock and farming tools, all in trust to pay the demands of the Orator, for which said *Mack* had become bail, and to account with the orator for the balance. Also, that before the seventh of May in said year, *Mack* had been sued as trustee of said Orator, and, to secure him in this and the other matters, the Orator conveyed him two other pieces of land, in trust, to sell and account for, after this trustee-action should be settled—That said *Mack* gave back a writing showing said trust in the first instance, but not in the last—That said *Mack*, sold said lands to one *Josiah Wilber* for a large sum, received a part of the pay, and took his notes for the remainder. Also, that he had sold the stock and farming tools, &c. and received large sums of money therefor—That *Mack* refused to account for this property, but had confederated with the other defendant, *Phelps*, and conveyed to him the notes given by *Wilber* for the land, &c.—That both had been applied to, but refused to render any account of the property, or to pay the balance to the orator ; and prayed that they might be compelled to render an account, and pay him whatever should appear to be due to him.

The respondents severally answered to this bill of complaint.—*Mack* acknowledged the receiving the property, but denied all the trust, except what is described in the writing he gave to the orator when he received his first deed. He also answered, that the stock he received was of less value than $150, and when he received it, the orator executed to him a writing which he attached, as part of his answer, which appeared to be a conveyance of the stock for the security of $150 received by the orator of *Mack*. He also attached to his answer a schedule of the monies received and paid out by him. The defendant, *Phelps*, answered that he purchased of *Mack* certain notes against *Wilber*, and took an assignment of a mortgage given to secure the payment of these notes, and that he paid *Mack* for the same ; and denied any knowledge of any trust or confidence between *Mack* and the orator. These answers were traversed, and the testimony taken and published. At the February term of this Court, in 1828, *Mack*, considering himself liable to account, so far as required by the writing he gave the orator when he received the first deed, submitted to a decree, that the account be taken without prejudice ; that he might be at liberty to contest his liability to account with regard to some of the matters charged. *Phelps* resisted the account altogether. There was, then, a hearing as between him and the orator, upon the question of his accounting.

Windham, *February*, 1829.

Towle *vs.* Mack *et al.*

Upon the hearing with regard to both defendants, the testimony was referred to by the solicitors, and by the Court in their opinion, with such correctness, it needs no recital here.

*Argument for the Orator against Mr. Phelps.* This defendant admits, in his answer, his commencing a trustee-action against *Mack*, as trustee of the Orator, for his own debt against the orator, and the settlement of the same. He admits his receiving the *Wilber* notes, &c. to the amount claimed by the orator. His receipts show he collected the same. He denies in his answer, that he ever received any other property of said *Towle*. He denies also, that he had notice, or knew that said farm was conveyed to said *Mack* in trust, to sell the same, &c. or that the said notes and mortgage were the property of said complainant.

Had this defendant such notice, or imformation, as would put him upon enquiry? It is not necessary that he should have had direct and formal notice; still less, knowledge. *Dexter* vs. *Harris*, 2 *Mason*, 536.

1. He had constructive notice from the record of the declaration of the trust, like a separate defeasance of a mortgage. This was recorded the day of its date. He does not deny knowledge of the *record*.

2. He brought a trustee-suit against *Mack* as trustee of *Towle*, soon after *Towle* went away; which was settled with *Mack* the 16th of Dec. 1819, before the assignment of any of the notes.

3. *Mack* settled the suit with *Phelps* himself; he told *Phelps* how it was. *Phelps* told him he could not defend, and he settled.

But how is the proof on this point?—*Ebenezer Huntington* testifies, that he was informed by *Charles Phelps* and *James Mack* that he had brought his action against said *Mack* to recover of him a sum of money which *Phelps* pretended was due to him from *Towle*, and thinks, during the pendency of said suit, *Phelps* informed the deponent that *he* was acquainted with the way and manner in which *Mack* received *Towle's* property—That *Phelps* said the notes were given for the farm, &c.

*Nathan Wyman* testifies, that, soon after the commencement of the suit, *Charles Phelps* vs. *Mack*, to recover a debt said by *Phelps* to be due to him from *Towle*, *Phelps* enquired of deponent respecting *Mack's* having *Towle's* property in his hands, and this deponent informed *Phelps* that *Mack* had the property of *Towle* in his hands, and was agent; for *Mack* had informed this deponent that there would remain in his hands, of *Towle's* property, more than $500, after paying all his debts, &c.

*Samuel Kinsley* testifies, that in December, 1820, or in June,

WINDHAM, *February*, 1829.

Towle *vs.* Mack *et al.*

1821, the deponent enquired of *Phelps* why it was that some people in *Windham* were unfriendly to *Mack* in the *Wilber* case, and interfered to prevent a settlement between them? *Phelps* said that was because *Mack* had taken *Towle's* property into his hands and helped *Towle* to run away.

*Samuel Arnold*, Esq. says, that in August or September, 1821, he called on *Mack* for a settlement, which he then refused; but said he had the three last of these notes—but would take advice. The deponent called on him again in September or October, of the same year, at which time he had taken advice of *Charles Phelps*, Esq. and refused to account or settle.

*Phelps'* account, not made out at the time of the dates of the several transactions, purports to have been entered *on or about* the 1st of May, 1822. It must have been made out to answer some purpose. When was it actually entered on book? and for what purpose? It is entitled to no credit.

The question returns, had *Phelps* such information upon the subject as will charge him with the consequences of notice? If *Phelps* had notice that the property which he was purchasing was *trust* property, he must be accountable to the *cestui que trust.*—All persons coming into possession of property, bound by a trust, with *notice of the trust*, shall be considered as trustees. 2 *Mad.* 103.—*Ham. Dig.* 638.—1 *Scho. & Lef.* 262.—16 *Vesey, Jr.* 249, 253, *Daniel* vs. *Davison.* Though a purchaser did not know of any incumbrance before he paid his money, inasmuch as he knew it before the deed was executed, it affects him with notice. 1 *Atk.* 384.

One, taking from a trustee with notice, levies a fine: this shall not bar the *cestui que trust.* 2 *Mad.* 103.—*Ham. Dig.* 647.—1 *Scho. & Lef.* 379.—4 *John. Ch. Rep.* 138.—1 *Scho. & Lef.* 355, 379.—*Ham. Dig.* 627.

If a purchaser have notice of a trust at the time of the purchase, he becomes the trustee, notwithstanding the consideration paid.—1 *John. Ch. Rep.* 566.

No act of the trustee can vary the rights of the *cestui que trust.*—*Ham. Dig.* 641.—8 *Ves.* 341.

Property held in trust does not pass to the representatives of the trustee; but as long as it can be traced and distinguished, it goes to the benefit of the *cestui que trust.* 1 *John. Ch. Rep.* 119.

A person, claiming as a *bona fide* purchaser for a valuable consideration, must deny the fact of notice of the trust, and of every circumstance from which such notice might be inferred. 1 *John. Ch. Rep*, 566.

*Argument for Phelps.* The defendant, *Phelps*, contends,—1. That, as to purchasing the notes, if with notice of the general trusts, he cannot be called on to account. Even a purchaser of a trust estate, from a trustee with a general power to sell to pay debts, cannot be holden to account, or see to the application of the purchase-money. *Sugden on Vendors*, 368, *note g*. Certainly, then, the purchaser of a *negotiable security*, given for such estate, cannot be liable. Even a purchaser of stock is never called to account, but the trustee only, and his representatives, have to replace it. 4 *Ves. Jr.* 497.—5 *id.* 799, 800.—1 *id.* 297.

2. That, as to any *improvident law-suits*, the defendant is not implicated in any improvident management of the same. But, it is pretended that defendant knew the property (the attachment of which gave rise to the suits) to be of doubtful ownership, and this rests solely on the testimony of *S. Kingsbury, Esq.* who says, "That in 1820, he was called on to sign the writ *Mack* vs. *Wilber*,—that he advised *Mack*, under existing circumstances, not to have the writ served, as he then understood *Leonidas Wilber* claimed the property *Mack* was about to attach, and that they *(Mack* and *Phelps)* seemed to think the holding it doubtful." Now, *Esq. Kingsbury did not sign* the writ *Mack* vs. *Wilber*, which was signed by *E. H. Ranney, Esq.* and served 14th August, 1820, but signed the writ *Theos. Crawford* vs. *L. Wilber*, which was dated 17th November, 1820, and after the controversy had commenced; from which it is most evident that the witness is mistaken, probably from confounding, through defect of memory, the one writ with the other. Besides, the suits ended in a recovery, indicative of *Mack's* right to take the property. So, too, the testimony of *Arnold* would seem to indicate that *Phelps* bought the notes of *Mack* after *Arnold* had applied, with his power, for settlement, and with knowledge of such application. But it ought not to affect *Phelps*, being the statement of *Mack* alone. Besides, it is not true. The sale to *Phelps* was made two months before the execution of the power to *Arnold.*

Lastly, it is not charged, or proved, that *Mack* is insolvent, or unable to make the plaintiff good for any trusts he may have entered into.

During the same term, in 1828, HUTCHINSON, Chancellor, delivered the opinion of the Court, on the question of compelling *Phelps* to account :

The principal question is, whether *Phelps* knew, when he purchased of *Mack*, that the latter held this property in trust. He, in his answer, denies such knowledge. For the purpose of decid-

WINDHAM, *February*, 1829.

Towle *vs.* Mack *et al.*

ing this question, we are to consider it settled, that *Mack* was trustee of the orator. And no decree will finally be made, against *Phelps*, for any thing beyond what is also charged upon *Mack*.

As evidence tending to show his knowledge, the first deed from the orator to *Mack*, and the writing given to the orator by *Mack*, of the same date, were upon record in the town clerk's office. That writing showed the trust so far. *Mack* became trustee, as appears by that record, March 24th, 1819. Within a few days afterwards, *Phelps* learned so much about the trade that he ventured to sue out a trustee-process against *Mack* to secure his own debt against the orator. *Wyman* testifies, that, soon after this suit was brought, and while *Phelps* was making further enquiry about the trade of *Mack* and the orator, he, witness, told *Phelps* that *Mack* was agent of the orator, and had the property of the orator in his hands; that *Mack* had told him that he had more than $500 more than would pay all the orator's debts. In August, 1820, *Phelps* made writs for *Mack*, on some of the notes against *Wilber*.

While the trustee-suit was pending, *Phelps* told *Huntington* he knew the way and manner in which *Mack* received *Towle's* property; that the notes were given for the farm. These things put together are very convincing that *Phelps* knew enough to remove from his mind all doubts of *Mack's* being the trustee of the orator to some amount. It seems further that *Mack* made no secrecy of it, so far as relates to the first conveyance. It became pretty much a matter of public notoriety. And, while *Phelps* was commencing and prosecuting his trustee-action, he had a direct interest to learn the facts, and, when he received his debt, secured by that suit, he must have been fully confirmed in his belief that *Mack* was trustee of the orator.

But it is said this does not make *Phelps* chargeable as trustee. There is no doubt but *Mack*, by the nature of his trust, had a right to sell the property with which he was intrusted, and turn it into money to pay the debts of the orator; and the man purchasing of *Mack*, and paying his money, would be safe in so doing. This was the situation of *Wilber*, so far as he made payment. But this is not the case with *Phelps*. It appears, by his answer, and the schedule therein referred to, that he paid *Mack* for the notes against *Wilber* and the assignment of the mortgage, by discharging his own account and notes against *Mack*, and giving him a writing to pay the balance of about seventy-six dollars, when the money should be collected. This was receiving of *Mack*, in satisfaction of his own debt, and converting to his own use, the money which he must have known belonged to the ora-

tor, and which *Mack* had no right thus to pay away in discharge of his own debts.

Let the decree be entered, that the defendant, *Phelps*, also account before the Commissioner.

*Milo N. Bennett, Esq.* was then appointed a special Commissioner, to take the accounts of both defendants, and report at the next term of this Court; and the cause was continued.

At the present term, said Commissioner made his special report accompanied with all the items of the accounts rendered and demands claimed. The items of the accounts reported as allowed, both ways, include interest to the present time.

After the introduction and reference to the accompanying schedules, the report proceeds as follows:

"And I do further report, that I find; the real estate, described in the orator's bill of complaint, was conveyed by the said *Ebenezer Towle* to the said *James Mack*, at, or about the time therein specified, and that the value of the same in 18[illegible] was six hundred and fifty dollars, and the value of each respective lot I report to have been as follows, viz: The seventy-acre lot of the value of 350 dollars, the twenty-five-acre lot of the value of 175 dollars, and the fifty-acre lot of the value of 125 dollars. And I do further report that the said *James Mack* sold the said lands, including a heifer and two swine, upon a joint contract on the 30th day of July, A. D. 1819, for the sum of seven hundred dollars, to one *Josiah Wilber;* and that the said *James Mack* has received personally, from the avails of said sale, the sum of 242 dollars 25 cents, including the interest on the same up to the 17th day of February, A. D. 1829, and that the said *Charles Phelps* has received, on the said notes given by said *Josiah Wilber* to James Mack, in part payment of said land, and by him negotiated to said *Phelps*, the sum of eight hundred and sixty-eight dollars and one cent, including interest on the same up to the 17th day of February, A. D. 1829. And I do further report, that the sum of two dollars fifteen cents due from said *Mack* to said *Towle*, for the rent of real estate including interest to the same 17th day of February, A. D. 1829. And I do further report, that I find personal property belonging to the said *Towle*, has gone into the hands of said *Mack*, and by him either disposed of, retained, or converted to his own use, to the amount of 336 dollars and four cents, including a computation of interest, up to the 17th day of February, 1829, for which the said *Mack* is justly chargeable. I further report, that I find the sum of 695 dollars 43 cents, including interest on the same to the 17th day of February, A. D. 1829, due from the said *Towle* to said *Mack*, for monies paid to the use of said *Towle*, for property delivered him, and personal services rendered in the performance of said trust, for which the said *Towle* is, and ought to be, justly accountable to the said

WINDHAM, *February*, 1829.

Towle *vs.* Mack *et al.*

*James Mack.* I further report, that, provided the Supreme Court, as a court of chancery, shall be of opinion, that the said *James Mack* is justly entitled to an allowance and compensation, from said *Towle*, for his personal services and money paid out in the law suits and arbitration, referred to in the said *Mack's* answer, then, in that case, I report the following sums to be a reasonable compensation for the same, to wit: for personal services and money paid out in the suit of *Leonidas Wilber* vs. *Timothy Burton*, commenced at the December term of the county court, 1820, the sum of fifty-eight dollars forty-six cents, including a computation of interest to the 17th day of February, 1829; and for the costs of the arbitration therein referred to, the sum of fifty-five dollars ninety seven cents: for the personal services and money paid out in the suit of *Leonidas Wilber* vs. *Mack* and *Burton*, commenced at the December term of the county court, 1821, the sum of two hundred twelve dollars eighty-three cents, including interest to the same 17th day of February, 1829, deducting therefrom forty-two dollars seventy-two cents, it being for the sum of forty dollars and interest on the same, paid *James Mack* by said *Wilber* on settlement of the above cause. I further report, that the said *James Mack* claims an allowance against the said *Towle* of one hundred and fifty dollars, and interest on the same from the first day of March, 1820, it being the sum specified in the condition of the bill of sale of certain personal property from said *Towle* to said *Mack*, bearing date the 24th day of March, A. D. 1819; and whether the said *James* is entitled to an allowance of the same, is referred to the Court for their decision; the amount being, on the 17th day of February, 1829, including interest, two hundred thirty-seven dollars sixty-seven cents. I further report, that the testimony of *Daniel Cobb, jun.*, *Levi Kimball* and *Timothy Sherwin*, was offered to show the value of the several pieces of land described in the orator's said bill, which was objected to by the orator's counsel, but the objection overruled by me, and the testimony admitted. I further report, that *Timothy Burton* was offered by the orator as a witness, and it was objected by the defendant that he ought not to be examined, he having been once examined in chief; but the objection was overruled, and the witness again examined before the master. I further report, that the testimony of the witnesses examined before me, in taking the accounts, was taken down in writing, and is herewith transmitted to this Hon. Court. All which is respectfully submitted. Given under my hand at Londonderry, in the County of Windham, this 22d day of November A. D. 1828.

"MILO L. BENNET, *Mas. in Chancery.*

RECAPITULATION.

| | |
|---|---|
| Whole amount of the real estate, including interest, | $1112 41 |
| Whole amount of personal estate charged against *Mack*, - - - - - - | 336 04 |
| | $1448 45 |
| Amount allowed *Mack*, - - - | 695 48 |
| Balance, - - - - | 752 97 |
| Amount of the expenditures on the first suit as liquidated by me, - - - | $58 46 |
| do. do. at arbitration, | 55 97 |
| Balance liquidated on second suit, - - | 170 11 |
| Amount claimed by *Mack* from *Towle* by virtue of the condition in the bill of sale, - - | 230 67 |
| | $515 21 |
| Balance over and above all claims adjusted by me, is | $237 76. |

M. L. BENNET."

After the foregoing report was filed, Mr. *Phelps*, filed his exceptions to the allowance of the amount in his hands; also to the disallowance of his payments to *Mack*. The cause was set down for a hearing upon these exceptions, also upon the whole merits of the account against *Mack*, it being decreed to be taken, as to him, without prejudice.

*Argument for the orator* in reference to *Mack*, and the exceptions of *Phelps*.

The answer of *Mack* admits, that he received the deed first mentioned, upon the trust, mentioned in an instrument in writing, executed by him to the orator of the date of the deed.—This trust is declared by deed under seal of the same date as the conveyance, witnessed by two witnesses, acknowledged, and recorded, in which the trust is declared in these words, to wit:—"I hereby promise, that, after the settlement of certain debts and "demands against said *Towle*, which I have agreed to settle, I "will either re-deed said land to said *Towle*, or pay him or his "heirs or assigns whatever may remain of the avails of the sale "of said land."

The defendant also admits that the personal property enumerated, was received upon the condition of a certain writing marked A. This on the face of it seems to be a mortgage or pledge to secure to said *Mack* the payment of one hundred and fifty dollars.

WINDHAM, *February,* 1829.

Towle *vs.* Mack *et al.*

It is not pretended by the answer, that this was to secure a previous debt; but as, by the other trust, *Mack* was to account for the *whole* value of the estate conveyed. It might have been that *Mack* was to have this personal property, or $150, for his trouble. But it is contended by the orator that he was to have a reasonable compensation for his trouble, and account for this property also.

With respect to the deeds of the seventh of May, 1819, the defendant in his answer says, that "after the 24th day of March, "1819, and before the 7th day of May, 1819, the defendant was "summoned to answer in Court as trustee of said orator, according to the statute relating to absconding or concealed debtors; "the service of which process was made known to the orator; and "the defendant informed said orator, he had fears he should be "injured by reason of his, the defendant's undertaking to assist "said orator: and thereupon the orator on the 7th day of May, "1819, at said *Windham,* did make, execute and deliver to the "defendant, two several deeds of the 2d and 3d pieces of land, "mentioned in the complainant's said bill of complaint." And the defendant denies that the two last deeds were executed upon any *trust* or *confidence,* or upon any *condition* whatever.

These two deeds were executed, because he feared he might be injured in consequence of accepting the trust, or, in other words, to indemnify the said *Mack* in executing the trust. This places it on the same trust as the first deed. Yet, he denies that he received them upon any trust, or confidence, or condition. He must mean *expressed in writing.*

But, let us see how he treated these conveyances himself. In a letter of *Mack* to *Towle,* dated September the 24th, 1820, he says: "You wrote that you intended making a journey to "*Windham* in a short time. I would inform you, if you come at "present, that it is not in my power to assist you in any part of "what is your due, for I cannot get the payment that was due last "December, for $200 dollars; nor the one that was due in June," "which was $100. "I have only received $150 towards the farm yet. "Money is not to be had here at present, for there is nothing that "will sell at any price, which makes it bad for me. Some part of "what furniture *that you left here,* I sold with the farm. I sold "the whole at $700. The last payment is due December, "1821. There is no prospect of assisting you at present. I will "write you as soon as I can procure the payment."

The whole of the land conveyed to *Mack* by the three deeds, was conveyed by *Mack* to *Wilber.* The consideration, $700. By the schedule annexed, *Mack* refers to this whole fund, and

attempts to account for it. He no where claims any part of this as his own. How can he deny, therefore, that all the property left in his hands, is left under the same trust? He acknowledges in the letter, the receipt of furniture not contained in any of the writings; and he attempts to account for a part, which he says was sold with the farm. That appears not true. (See *schedule.*) "One yearling heifer and two swine were sold with the farm."

The defendant says in his answer, that he hath, in his schedule annexed, "set forth a *full, true, perfect,* and *particular* account "of the rents and profits of said premises, received by him or by "any person by his order, or for his use, or for or on account of "the sale of the said premises, &c." And the defendant further says, that "he hath, in the said schedule, "set forth a "full, true, and particular inventory of all and singular "the goods, chattels, personal estate, and effects, including farm- "ing tools and utensils, household furniture, stock on the farm a- "foresaid, promisory notes, bills, bonds, book accounts, and "choses in action, whatever, which hath at any time come to the "hands of the defendant from the orator, or of any other person "or persons, by his order, or for his use, and which the defend- "ant admits he received of the orator, and which he expected to "apply for *services done and money paid out* for the orator; but "the defendant denies they were received on any trust or confi- "dence, as set forth in the orator's said bill of complaint." "And "all the particulars whereof the same consisted, and the natures, "kinds, quantities, full, true and real value thereof, and of every "part thereof, together with such particulars as have been pos- "sessed or received by, or come to the hands of, the defendant, "or of any other person or persons by his order or for his use; "and how, in what manner, and when, and where, and by whom "and to whom, and for how much, the same and every part there- "of, hath been sold or disposed of, are set forth in said annexed "schedule."

1. It appears from this part of the answer, that he has set forth in the schedule a certain quantity of property belonging to the orator, which he admits he received from the orator, and which he expected to apply for services done, and money paid, &c. and yet denies any trust or confidence.

2. This constitutes, in so many words, a trust. What is he to do with what remains in his hands? Is he not to account? If not, he should have taken the property and agreed to pay his debts.

3. The proof is that it was a trust. *Ebenezer Huntington* says, that soon after the conveyance of *Towle,* of his property in *Windham,* to *Mack,* he informed the deponent that he was to pay

*Towle's* debts, and the balance of the property he was to pay over to *Towle*, after retaining sufficient to himself to pay for his trouble in doing the business—That he received from *Towle* personal property upon the *same conditions* he had received the real estate.

*Nathan Wyman* says, that *James Mack* informed him that he sold the lands of *Towle* to *Josiah Wilber*, for $700, and that *Towle* delivered to him all his personal property, and that he was to pay *Towle's* debts.

*Timothy Burton* says, that *James Mack* informed him that *Ebenezer Towle* had given him a deed of his lands in *Windham*, and that he was to pay *Towle's* debts, and return the balance to said *Towle*, and that he had given *Towle* a writing to that effect.

4th. He himself has treated the whole as a trust, and now pretends to account for the whole as such, in his answer. The defendant further says, "that by reason of his taking upon himself the sale of the premises aforesaid, and enforcing the payment, &c. he has incurred sundry expensive law suits," &c. This is a good reason for an account. The defendant further says, "that he denies the applications and requests as in said bill is mentioned." This would not affect the merits. If the defendant answered ingenuously, confessing the trust, and offering to account, &c. it might relieve him from the payment of costs. But this is flatly contradicted by the evidence. *Samuel Arnold, Esq.* says, "*Towle*, in March, 1821, gave him a general power of attorney, and, in consequence, in August or September, 1821, he called on *Mack*, told him he had a power, &c., and requested him to render an account and make a settlement of the business left in his hands by *Towle*, and requested him to deliver him the three last notes, for the sale to *Wilber*. *Mack* replied that he had the notes in question, but chose not to do any thing about it, till he had taken advice—That the deponent in September or October again called on him for a settlement of the *Towle* business: at which time *Mack* had taken advice from *Charles Phelps*, and refused to make any accounting or settlement," &c.

*Robert McCormick* says, "*Mack* informed him that *Samuel Arnold* attended the arbitration with *Leonidas Wilber*, and informed this deponent that soon after the arbitration, said *Arnold* called on him for a settlement of the concerns of *Towle* that were left with him. Also demanded certain obligations which *belonged* to *Towle*, executed by *Wilber* to *Mack* for the farm, &c. *Mack* said he should not give up any of the business to *Arnold*,"&c.

*Timothy Burton* says, "*Mack* informed him that *Arnold* called on him as agent of *Towle*, and that he was agent of *Towle*.

Mr. *Phelps* has filed two exeptions to the Master's report.— *First*. That the Master charged him with money received on notes—$272 88 on 28th May, 1821—$114, 1st December, 1821 —$233, 1st May, 1822—$288 13 for interest.

*Answer*. It is not stated that these notes were not the property of *Towle*, within the allegation of the bill. It was the property of *Towle*, and so found by the Master. It was so found on a traverse of the answer; and is within the decree to account.

*Second*. That the Master disallowed the account annexed to his answer of $868 01, and declared to be on testimony of payment.

*Answer*, This was excluded by the decree to account to *Towle* for the property of *Towle*. The answer contended for the right to account with *Mack*.

The orator insists that the defendant is not entitled to expenses for defending the suit *Wilber* vs. *Mack*, the costs of the arbitration, nor the costs of the last suit.

*Argument for Defendants*. 1. The proof, as to the first sale of land, consists in the deed from *Towle* to *Mack*, and the contemporaneous writing given by *Mack* to *Towle*, which was recorded in the Windham records 24th March, 1819; and which conforms to the defendants' answer. This land is found by the Master to be of the value of 350 dollars. It is submitted to the Court how far this deed is more than a mere mortgage, while *Mack* held the land and a covenant at law after the sale thereof, and how far the plaintiff is at liberty to treat the same breach of covenant as a breach of trust.

2. *The bill charges that the assignment of personal property was made from Towle to Mack in trust for the same purposes.*— The answer admits the transfer of certain personal property on 19th March, 1819, viz. 3 cows, 2 two-year-old steers, 1 yearling heifer, 1 calf and 11 sheep ; and that it was received for services done, and monies paid out ; and denies that it was upon any trust, and sets forth the bill of sale. The proof as to this matter, consists in the bill of sale, sealed and acknowledged, conditioned that if *Towle* shall pay *Mack* 150 dollars on or before the first day of March, 1823, the sale to be void, otherwise not. This property is set down by the Master at 147 dollars ; and there is also found by the Master other chattels turned into a watch, 16 dollars ; part of a note against *Charles W. Chandler*, 30 dollars ; furniture, 4 dollars 15 cents ; coat and cap, 5 dollars—45 dollars 15 cents in the whole.

But the plaintiff insists, that the whole personal property was delivered for the same purpose, and brings parol testimony of

WINDHAM, *February*, 1829.

Towle *vs.* Mack *et al.*

*Eben. Huntington*, who says *Mack* told him the personal was received on the same terms as the real property; and of *Nathan Wyman* who says *Mack* said, *Towle* had delivered him all his personal property, and he was to pay *Towle's* debts.

On the part of *Mack* it is contended that to the amount of $150 he is to be allowed out of the property—there being, then, an acknowledged debt, to himself of that amount; that the testimony, if taken in its most obvious import, goes directly to contradict the bill of sale, which cannot be done in this way by parol; but that, if taken in reference to the property not included in the bill of sale, it has been applied to *Towle's* debts, as appears by the Master's report.

3. The bill charges the conveyance of other lands on the same day, on the same trust, viz. the 50 acre piece, and the *Aiken*, or 25 acre piece. The answer admits the conveyance on the 7th May, 1819, *absolutely in fee*, of the same pieces of land; but denies that it was made in trust any way. The Master's report finds the 50 acre piece worth $125, the *Aiken* piece $175.

The proof, as to this matter, is the deed which is set forth in the answer without condition or trust expressed. But the plaintiff endeavors to shew the trust by parol testimony of *Ebenezer Huntington*, who testifies that *Mack* said, soon after the conveyance, he was to pay *Towle's* debts, and pay over balance due, deducting for his trouble—of *Timothy Burton*, who says *Mack* said *Towle* had given him a deed of land, and he was to pay *Towle's* debts, and had given him a writing to that effect—also, that he had received *Towle's* property as agent to pay debts, and had given a writing—of *Nathan Wyman*, who says *Mack* said he had sold the lands of *Towle* for $700: and plaintiff endeavors to sustain himself by the fact, that the lands were all conveyed by *Mack* to his vendee, by one and the same deed, and for the same consideration.

It is contended on the part of *Mack*, that the evidence does not shew any trust as to these lands, because the conversation with *Huntington* being stated by him to have taken place soon after *Towle* conveyed his land in *Windham*, applies not to the last deed, but to the first, in connection with which it is perfectly natural. The conversation with *Burton*, in connection with the expression, that "*Mack* had at the same time given *Towle* back a writing, can refer to none but the first deed. The statement of *Wyman* is merely descriptive. "Lands of *Towle*" is synonymous with the "*Towle* lands;" for they were also described as sold i. e. to *Wilber*. Nor is it known that there is any rule requiring even trustee with any power but such as obliges

him to sign in a different capacity, to make a separate deed. The effect of mingling the considerations only subjects him to greater hardship in shewing value and price. But if the evidence might in some cases show a trust, it does not in this case, being an attempt to contradict and create a condition to an absolute deed by parol. Nor can it be a resulting trust, since the same evidence used to establish the trust admits *a writing* which wholly excludes the idea of a resulting trust.

4. *The bill charges the wasting of the trust fund in improvident law suits.* Defendant contends that there have not been any within his knowledge; that the sale appears to have even exceeded the value; that the attachments were to secure the payment of the money, rather than take back the land and risk a resale; that the property attached was, under every presumption, proper to be attached; and that the decisions so proved it; and that the suits were conducted to the best of his ability. But the plaintiff endeavors to prove, by *S. Kingsbury,* that defendant had notice of doubtful ownership before the attachments. This is shewn to be a mistake, as *Kingsbury* did not sign the writ before the attachment, but did sign one afterwards. Besides, *Towle* recognized the suits, when he undertook to settle them with *Wilber.*

5. *The bill charges refusal to settle and deliver up property on demand.* Defendant contends, that having become responsible for the event of the suits, he was not under any obligation to part with his security without indemnity, which was not offered.

The opinion of the Court, upon the points argued, was pronounced by

HUTCHINSON, Ch. Upon a full hearing of this cause at the last term, as it respected the defendant *Phelps,* it was decreed that he should account. The real amount of which was, that he had so associated himself with *Mack,* and had received from *Mack* the property of the orator, under such circumstances, that, if *Mack* was liable to the orator upon the charges in the bill, *Phelps* is also liable with him, to any extent not exceeding the amount of the property of the orator, received by *Phelps* of *Mack.* That amount, as reported by the master, is $868 01, including interest to this time. Mr. *Phelps* excepts to this report, both because the claim is allowed against him; and because his payments to *Mack* were not allowed him as an offsett. Both these exceptions present but the same questions that were considered and decided, in their full extent, in the decree that he should account. Dis-

WINDHAM, *February*, 1829.

Towle *vs.* Mack *et al.*

covering no cause to be dissatisfied with that decision and decree, and, perceiving, that the sum in his hands exceeds the amount now claimed as against *Mack*, we proceed to dispose of the questions raised in the controversy with *Mack*.

There has been no attempt to excite a doubt of the liability of *Mack* to account with the orator for the avails of the land first deeded. The declaration of the trust, in the instrument recorded, has put that point at rest. Hence he submitted to a decree to account without prejudice, that is, saving his right to resist wholly other claims set up in the bill. So we treat the case; though there has been some misunderstanding or misrecollection upon the subject.

The lands conveyed to the orator by *Mack*, by the two deeds of May 7th, 1819, have been sold by him; but he denies all liability to account for the same. The deeds are absolute, and no writing is shown, creating any condition agreed to at the time. *Mack* also denies in his answer, that the said two deeds were executed upon any trust or confidence, or upon any condition whatever. He seems not well advised in this part of the answer; for, he had just before related the circumstances under which they were executed. After receiving the first deed and some personal estate, and becoming bail for the orator, he was sued as his trustee. He told the orator of this, and also told him "he feared he should be injured by reason of his, the defendant's, undertaking to assist said orator; and therefore, the orator did, on the said 7th day of May, execute and deliver to the defendant the said two deeds of said second and third pieces of land."— The very terms of this part of the answer disclose a trust. They disclose the reason of the giving of the deeds. It was to prevent *Mack* from being injured by his assisting the orator. These deeds authorised *Mack* to sell the lands; but he had no right to the avails beyond what would save him harmless. It is difficult to conceive what he could mean, by denying the trust in his answer, unless it be, that they made no particular contract defining and regulating any trust or condition. So far it may be true; but, the very receiving the deeds as security for his assisting the orator, created him trustee for the orator, and liable to account for the balance. Indeed, *Mack* seems himself, to have entertained the same sense of his liability, while executing his trust, till about the time he sold the notes and assigned the mortgage to Mr. *Phelps*. When he sold the three pieces of land, he conveyed all by one deed. The price of the whole was fixed in gross. The instalments seem to have an entire reference to the

convenience of payment, and not to the accounting with different persons. The payments were all secured by one mortgage deed. His letter to the orator, informing that no money was collected for him, speaks of all these notes, as sources of receiving money for the orator, and alludes to them by stating the times when they severally become payable. He told *Wyman* that over five hundred dollars would belong to the orator, after paying the debts which he, *Mack*, was to pay. This could not be true, otherwise than by considering the whole of this property alike holden in trust for the orator.

The Commissioner has reported a claim of the defendant, *Mack*, set up in his answer, of $150,for which the personal estate, stock, &c. was pledged. *Mack* contends that, if he accounts for the stock pledged, this demand secured by the stock, as by the bill of sale, must be allowed to him. The Commissioner has ascertained the sum, and referred this claim to the Court; and we discover no grounds for allowing it. He presents none in his answer. He says in his answer, that he received such and such property, naming it, worth less than $150, "and, upon that occasion, the orator did then execute to the defendant a certain writing," of which he annexes a copy. The terms of that are, that the orator may redeem the property by paying $150.

If the orator was about to convey this personal property to the defendant, and mingle it in the common trust, the writing, or bill of sale, should show some consideration, in order to be of binding force. Probably this writing was deemed by the parties a proper instrument to show the title of *Mack* in the property. But, if *Mack* will contend that the $150, named in that writing, is a debt due to him in equity, it was incumbent on him, when accounting under oath, to tell something more than that such a writing was executed. He ought to have also said, that the sum was due him, and told for what it became due. Without so much, when the defendant is witness to his own claim,no equity appears in his favor; but that stock, &c. mentioned in the bill of sale, must be considered subject to the same trust as the real estate.

With regard to the claims of *Mack* for the costs of the first suit, and of the arbitration, nothing appears but that he acted in good faith in those expenditures. It is said there was no need of attaching the property, as the notes were secured by the mortgage. But a suit upon the mortgage would only bring the land back again, and that was not the object of the orator. It was proper to endeavour to collect the notes in the usual way. And nothing appears of any imprudence in *Mack's* making the first attachment.

<div style="float:left">

WINDHAM,
*February,*
1829.

Towle
*vs.*
Mack *et al.*

</div>

Nor do we think the arbitration so unauthorized, as to compel *Mack* to lose the costs. The business was done in his name.— He employed the officers and must defend them. And we must allow him to manage the concern as he would his own, if done in good faith. The costs of the first suit and of the arbitration, as reported by the Commissioner, are allowed the defendant. The cost of the last suit, reported at $170 11, stands upon a different ground. That wholly accrued after *Esq. Arnold* had received a power of attorney from the orator for the purpose, and had called upon *Mack* for a settlement, and requested him to deliver over the notes against *Wilber*, and *Mack* had refused. After that refusal, he acted upon his own responsibility. He ought, when thus called upon, to have made a settlement, and surrendered the trust. This claim is disallowed.

Taking, then, the sum reported as due from *Mack*,    $237 76
Add thereto the said cost disallowed, which the master provisionally allowed,   -   -   -   170 11
To this add said amount of personal property and interest, which he deducted,   -   -   -   230 67

Makes due from said *Mack*   -   -   $638 54

And the decree of the Court is, that the defendants pay that sum to the Clerk of this Court, for the benefit of the orator, on or before the first Monday of August next, together with interest on said sum from this time till the time of payment, together, also, with the costs of this suit; and that, on failure, execution may then issue for the same against both defendants.

*Kellogg*, solicitor for orator.
*Bradley*, solicitor for respondents.